UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

03 JAN 31 PM 4: 32

U.S. DISTRICT COURT
N.D. OF ALABAMA

EVA KEETON,         )
                    )
    Plaintiff,      )
                    )
v.                  )         CV 01-BE-3109-S
                    )
CORRAL SOUTHEAST, L.L.C.  )
                    )         **ENTERED**
    Defendant.      )
                              JAN 3 1 2003

Memorandum Opinion

The court has a variety of motions before it in this case: Defendant's Motion to Stay Judicial Proceedings (Doc. 20-1); Defendant's Motion to Compel Arbitration (Doc. 20-2); Defendant's Motion to Dismiss (Doc. 20-3); Defendant's Request for a Status Conference (Doc. 26); and Plaintiff's Motion to Require Defendant to Answer Plaintiff's Complaint (Doc. 27). Upon review of the record, Defendant's Motion to Dismiss (Doc. 20-3) and Defendant's Motion to Compel Arbitration (Doc. 20-2) are due to be **GRANTED**. All other motions pending in this case are due to be **DENIED**.

I.

On February 27, 2001, Plaintiff Eva Keeton was hired to work as a server at Golden Corral #726, a family-style restaurant located in the Centerpoint section of Birmingham (hereinafter "Golden Corral #726" or the "restaurant"). Defendant Corral Southeast is the owner and operator of Golden Corral #726, as well as another Golden Corral restaurant, #743, located in Hoover, Alabama. In its capacity as owner and operator of Golden Corral #726, Corral Southeast apparently

28

was responsible for the direction of the day-to-day work activities of restaurant employees, including Keeton. However, upon her hire, Keeton, like other restaurant workers, signed a one-page document acknowledging that she might be "assigned" to SkilStaf, Inc. ("SkilStaf"), a professional employer organization that provides human resources on an outsource basis, which would, in turn, "lease" her back to work at the restaurant. That document, entitled, "SkilStaf, Inc. Leased Employee Information," states in part as follows:

> I understand that Golden Corral #726, herein referred to as Client, and SkilStaf, Inc., have entered into an agreement whereby I may be assigned to SkilStaf, and SkilStaf, Inc. would become my employer of record for wage and payroll reporting purposes. SkilStaf, Inc. would assume responsibility for administration of unemployment, workers' compensation, and other employee benefits.

Exhibit A to Defendant's Motion to Stay (hereinafter "Leased Employee Information" document).

Keeton alleges that, starting on her first day of work at Golden Corral #726, she was subjected to sexual harassment by several kitchen workers. She further maintains that she reported such harassment to Mike Sisk, the general manager of the restaurant, but he failed to discipline the offending employees. And because Sisk did nothing to stop the harassment, Plaintiff claims, she had no choice but to quit her employment, which she did on May 4, 2001.

After filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), Keeton initiated this action on December 5, 2001, asserting claims against "Golden Corral Corp." based upon the alleged harassing conduct committed by the kitchen workers. (Doc. 1). On January 3, 2002, Keeton filed her now-controlling "Amended and Restated Complaint" (Doc. 6), which substituted Corral Southeast as the sole defendant and advanced claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., as well as pursuant to Alabama law. More particularly, Keeton alleged that, because of sex, she was both subjected to a

hostile work environment and constructively discharged, in violation of Title VII, and that Corral Southeast is also liable under state law for the torts of "outrage," negligent supervision, negligent retention, assault, and battery.

On April 15, 2002, Corral Southeast filed the instant motion to stay these judicial proceedings and compel arbitration, or, in the alternative, to dismiss Keeton's complaint on the ground that her sole remedy against Corral Southeast is through binding arbitration. In support, Corral Southeast points to the Leased Employee Information document that Keeton signed, relying upon a provision therein stating that she agreed to submit certain claims to binding arbitration in lieu of bringing a court action. The provision Corral Southeast references states as follows:

> ARBITRATION OF EMPLOYEE RIGHTS: Because of, among other things, the delay and expense which result from use of the court systems, I agree (and SkilStaf also agrees) to submit to binding arbitration any claims that arise between me, SkilStaf, the client, its parent and affiliate corporations and any of their current or former officers, directors, employees, attorneys and agents, concerning compensation, workers' compensation, employment conditions (including, but not limited to, any claims concerning discrimination or harassment of any type), or termination of employment. . . . In any arbitration, the then prevailing rules of the American Arbitration Association (and, to the extent not inconsistent, the then prevailing rules of the Federal Arbitration Act) shall apply.

Id.

On May 6, 2002, Keeton filed her response in opposition to the motion, wherein she raises two main arguments. First, she asserts that the arbitration provision does not apply to her claims against Corral Southeast, a non-signatory to the Leased Employee Information document. And second, she urges that even if the arbitration provision does encompass claims against Corral Southeast, the court should nonetheless decline to stay these proceedings and compel arbitration, because, she alleges, if she is required to pay any fees or expenses associated with arbitration, such

costs will prohibit her from being able effectively to vindicate her statutory Title VII claims in the arbitral forum.

## II.

### A.

The validity of an agreement to arbitrate is generally governed by the Federal Arbitration Act ("FAA" or the "Act"). See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24 (1991). Congress enacted the FAA in 1925, as the Supreme Court has explained, for the purpose of "revers[ing] the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and . . . plac[ing] arbitration agreements on the same footing as other contracts." Id. The FAA accomplishes this objective primarily through its principal substantive provision, section 2, that states that a written provision in "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Sections 3 and 4 of the Act buttress section 2's policy favoring enforcement of arbitration agreements by authorizing, respectively, stays of proceedings in federal district courts when an issue in the proceeding is referable to arbitration, 9 U.S.C. § 3,[1] and the issuance of court orders compelling arbitration when

---

[1]The relevant portion of 9 U.S.C. § 3 states:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had. . . .

one party has failed or refused to comply with an arbitration agreement, 9 U.S.C. § 4.[2]

Thus, the FAA amounts to "a congressional declaration of a liberal federal policy favoring arbitration agreements," and its effect "is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). Employment contracts, except for those covering workers engaged in transportation, are covered by the Act. Circuit City Stores, Inc. v. Adams, 532 U.S. 105 (2001). Further, pre-dispute agreements requiring an employee to submit statutory federal employment discrimination claims to binding arbitration may be enforceable under the FAA. See id. at 123 (Americans with Disabilities Act claims); Gilmer, 500 U.S. at 30-32 (Age Discrimination in Employment Act claims); Bender v. A.G. Edwards & Sons, Inc., 971 F.2d 698, 700 (11th Cir. 1992) (Title VII claims).

However, "the FAA's proarbitration policy does not operate without regard to the wishes of the contracting parties." Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 57 (1995). Indeed, the FAA is "at bottom" simply "a policy guaranteeing the enforcement of private contractual arrangements . . . ." Mitsubishi Motors Corp. v. Soler Chrysler--Plymouth, Inc., 473 U.S. 614, 625 (1985). Accordingly, the FAA "does not require parties to arbitrate when they have not agreed to do so," Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 478 (1989). "Nothing in the statute authorizes a court to compel arbitration of any issues, or by any parties, that are not already covered in the agreement." E.E.O.C. v. Waffle House, Inc.,

---

[2] 9 U.S.C. § 4 states in pertinent part, "A party aggrieved by the alleged ... refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court ... for an order directing that such arbitration proceed in the manner provided for in such agreement."

534 U.S. 279, 289, 122 S.Ct. 754, 762 (2002).

The question of whether a party is bound to arbitrate, as well as what issues it must arbitrate, generally are matters to be determined by the court on the basis of the language of the contract between the parties. See Waffle House, 122 S. Ct. at 762; First Options of Chicago v. Kaplan, 514 U.S. 938, 943, 947 (1995); AT & T Tech., Inc. v. Communications Workers of America, 475 U.S. 643, 649 (1986). "When deciding whether the parties agreed to arbitrate a certain matter . . ., courts generally should apply ordinary state-law principles that govern the formation of contracts." First Options, 514 U.S. at 944. However, the FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Moses H. Cone Memorial Hosp., 460 U.S. at 24-25.

B.

Keeton maintains that the language of the arbitration provision in the Leased Employee Information document she signed does not indicate that she agreed to arbitrate claims she might have against Corral Southeast. Keeton does not appear to dispute that the document is the manifestation of a valid agreement to arbitrate certain claims she might have, but she contends that such agreement is between only herself and "SkilStaf, Inc." She points out that Corral Southeast is not a signatory to the agreement, and she emphasizes that no where does the document ever mention the name "Corral Southeast." Therefore, she asserts, Corral Southeast cannot invoke the arbitration agreement as a means to preclude her from bringing her claims in this court.

Corral Southeast admits that it is not a signatory to the arbitration agreement set forth in the Leased Employee Information document. Nonetheless, Corral Southeast argues that it has standing

under the arbitration agreement to require Keeton to litigate her claims against Corral Southeast in an arbitral, rather than a judicial, forum, if she is to litigate them at all; Corral Southeast urges that the terms of the arbitration agreement expressly encompass employment dispute claims, including those relating to employment conditions, harassment, discrimination, and termination, not only between Keeton and SkilStaf but also between Keeton and SkilStaf's "client," which Corral Southeast asserts it is. See Defendant's Motion to Stay at 2-4.

"[A]s a general matter, one 'who is not a party to a contract has no standing to compel arbitration.'" Boyd v. Homes of Legend, Inc., 981 F. Supp. 1423, 1429 (M.D. Ala. 1997) (quoting Britton v. Co-op Banking Group, 4 F.3d 742, 744 (9th Cir. 1993) and citing Ex parte Stallings & Sons, Inc., 670 So. 2d 861, 862 (Ala. 1995)). However, the Eleventh Circuit has outlined three exceptions to this rule, wherein a party may invoke the benefits of a written arbitration agreement despite the fact that such party was not itself actually a party to that agreement. See MS Dealer Service Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir. 1999). The first exception allows a nonsignatory to compel arbitration pursuant to principles of equitable estoppel. Id. The second exists when, "'under agency or related principles, the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided.'" Id. (quoting Boyd, 981 F. Supp. at 1432). And the third "'exception arises when the parties to a contract together agree, upon formation of their agreement, to confer certain benefits thereunder upon a third party, affording that third party rights of action against them under the contract.'" Id. (quoting Boyd, 981 F.Supp. at 1429).

Corral Southeast's assertion that it is entitled to invoke the arbitration agreement is founded

primarily upon the last exception above, pertaining to third-party beneficiaries.[3] The third-party beneficiary exception may arise under two different sets of facts. Yeomans v. Homes of Legend, Inc., 2001 WL 237313, *4 (M.D. Ala. 2001). "The first situation arises when one who is a nonsignatory to the contract containing the arbitration provision, but who has received benefits under the contract, seeks to avoid arbitration." Id. (citing Ex parte Stamey, 776 So. 2d 85, 92 (Ala. 2000)). The second situation, and the one potentially present in this case, occurs when a "'nonsignatory third-party beneficiary attempts to enforce the arbitration provision against a signatory to the contract.'" Id. (quoting Stamey, supra). See also E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 195 (3rd Cir. 2001).

Whether an arbitration provision inures to the benefit of a third party and, in light of the circumstances surrounding the agreement, may be construed, to cover a given dispute presents an issue of contract interpretation to be analyzed under the applicable state law concerning the validity, revocability, and enforceability of contracts generally. Perry v. Thomas, 482 U.S. 483, 491 & n.9 (1987). Under Alabama law, a party claiming to be a third-party beneficiary of a contact bears the burden of establishing that the contracting parties intended, upon execution of the contract, to bestow a direct, rather than merely incidental, benefit upon it. Weathers Auto Glass, Inc. v. Alfa Mut. Ins. Co., 619 So. 2d 1328 (Ala. 1993); see also Yeomans, 2001 WL 237313, *4; Boyd, 981 F. Supp. at 1429.

---

[3]In her response in opposition to Corral Southeast's motion to stay, Keeton suggests that Corral Southeast is proceeding solely upon an equitable estoppel theory as the basis for standing to invoke the arbitration agreement. See Plaintiff's Response at 2 n.1. However, Keeton's assertion is unfounded. Although Corral Southeast's motion never employs the phrase "third-party beneficiary," Corral Southeast unmistakably is arguing that it is entitled to that very status under the arbitration agreement in its capacity as the alleged "client" of SkilStaf.

By signing the Leased Employee Information document, Keeton objectively manifested her intent to agree

> to submit to binding arbitration any claims that arise between [herself] and SkilStaf, the client, its parent and affiliate corporations and any of their current or former officers, directors, employees, attorneys and agents, concerning . . . employment conditions (including, but not limited to, any claims concerning discrimination or harassment or any type), or termination of employment.

Exhibit A to Defendant's Motion to Stay (emphasis added). Keeton acknowledges that the critical question is whether Corral Southeast is a party contemplated by the signatories when they agreed to that clause, but she urges that this provision must be read to encompass only disputes between her and SkilStaf. However, the above quoted language reasonably suggests that she is agreeing to submit to binding arbitration not only certain employment dispute claims that might arise between herself and SkilStaf, but also such claims that might arise between herself and the "client." The introductory sentence of the Leased Employee Information document, which is approximately two inches above the arbitration provision, expressly states that "Golden Corral #726" shall be referred to thereinafter in the document as "Client." Accordingly, the court finds Keeton's signature exhibits her assent to arbitrate certain types of claims arising between herself and "Golden Corral #726."

Keeton appears also to take the position, however, that "Golden Corral #726," should be viewed as distinct from Defendant Corral Southeast, L.L.C. and, thus, even if the former might be a third-party beneficiary eligible to compel arbitration, the latter is not. The court disagrees. "Golden Corral #726" might not be synonymous for all purposes with "Corral Southeast, L.L.C." Indeed, the former is merely the designation of the individual restaurant where Keeton understood she was to be working on an everyday basis, and it does not appear that the name "Golden Corral #726" represents any legally recognized entity. The latter, by contrast, is a legal entity that undisputedly

owns and operates Golden Corral #726. However, the third-party beneficiary analysis focuses upon whether the parties intended to bestow a benefit upon the one claiming rights under the contract. Here, SkilStaf and Keeton clearly agreed to bestow a benefit upon SkilStaf's "client," a contract term which cannot reasonably be interpreted to mean something other than the party responsible for the operation of "Golden Corral #726," with whom SkilStaf had entered into an employee "leasing" agreement. Again, no one disputed that such party is, in fact, Corral Southeast. The court concludes that Corral Southeast is a third-party beneficiary of the arbitration agreement. Therefore, Corral Southeast has standing to require Keeton to submit her claims against it to binding arbitration in lieu of bringing this court action.[4]

III.

Keeton also argues that the court should refuse to enforce the arbitration agreement because of the potential costs the arbitration might impose on her. Keeton points out that, while the arbitration agreement provides that the rules of the American Arbitration Association will apply, it does not otherwise state who must pay the costs of any arbitration or how much those costs might be. She contends, however, that "if she is required to pay any of the costs of the arbitration," she would not be able to effectively vindicate her statutory cause of action in the arbitral forum, as

---

[4]Because the court has concluded that Corral Southeast may invoke the arbitration agreement by virtue of its status as a third-party beneficiary thereof, the court pretermits any discussion of Corral Southeast's assertion that Keeton is equitably estopped from repudiating the arbitration agreement because her claims allegedly are "intimately founded in and intertwined with the underlying contract." Defendant's Motion to Stay, at ¶ 7 (quoting Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753, 757 (11th Cir. 1993) (quoting McBro Planning & Development Co. v. Triangle Electric Construction Co., 741 F.2d 342, 344 (11th Cir. 1984)).

The court also notes that while Keeton has disputed Corral Southeast's standing to invoke the arbitration agreement as a nonsignatory, she has not contested Corral Southeast's assertion that the scope of the agreement language is broad enough to encompass, and thus require arbitration of, all of the federal and state law claims she advances in this action.

required by Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 27-29 (1991). Plaintiff's Response at 6.

In Gilmer, the Supreme Court recognized that even claims arising under a federal statute designed to further important social policies may be arbitrated because "'so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum,'" the statute serves its function. See 500 U.S. at 28 (quoting Mitsubishi, supra, 473 U.S. at 637). Subsequently, the Supreme Court suggested in Green Tree Financial Corp. v. Randolph, 531 U.S. 79, 90 (2000), that the existence of large arbitration costs could preclude a litigant from effectively vindicating his or her federal statutory rights in the arbitral forum, and thus preclude enforcement of an arbitration agreement as it applies to the federal statutory cause of action.

Keeton has offered no evidence at all with regard to either the costs she anticipates she would face if she were to arbitrate her claims pursuant to the agreement or her ability to pay such arbitration costs, nor does she attempt to compare potential arbitration costs with the expenses that she would likely incur in connection with court litigation. Instead, Keeton merely states that she is not aware of the potential costs of the arbitration at this time, and she makes the naked and conclusory assertion that if she is required to pay "any" of the costs of arbitration, then she cannot effectively vindicate her federal statutory rights. The court concludes that Keeton has failed to satisfy her burden to demonstrate that the costs of arbitration would keep her from effectively vindicating her federal statutory rights under Title VII. At most, the record indicates only that there is some "risk" that Keeton might incur arbitration costs that are so much greater than those associated with court

litigation that they might be deemed prohibitive.[5] Therefore, under Green Tree, Keeton has failed to show that the arbitration agreement is unenforceable.

However, the court takes judicial notice of the high fees and costs involved in AAA arbitration. For example, the Eleventh Circuit in Paladino v. Avnet Computer Tech., Inc., 134 F.3d 1054, 1062 (1998), noted that "[b]ecause [employer] makes no promises to pay for an arbitrator, employees may be liable for at least half the hefty cost of an arbitration and must, according to the American Arbitration Association rules the clause explicitly adopts, pay steep filing fees..." In Paladino, the complaint did not seek a specific amount of damages, and as a result, plaintiff Paladino's claims incur a $2000 filing fee based upon the AAA Commercial Arbitration Rules Fee Schedule. Paladino, 134 F.3d at 1062 n.2. Because such a filing fee in addition to the fees of the arbitrator combine to make arbitration infinitely more expensive than litigation for an individual plaintiff like Keeton, the policy of this court is to condition an order of submission to arbitration upon the agreement by the party seeking arbitration to pay the fees and costs of arbitration.

IV.

Based on the foregoing, the court finds that Corral Southeast may, as a third-party beneficiary, invoke the arbitration agreement so as to require Keeton to arbitrate her claims against Corral Southeast, rather than litigate them in this court, and that Keeton has failed to show that the

---

[5]The arbitration agreement here does provide that the "then prevailing rules of the American Arbitration Association" would apply to the arbitration proceedings. Although the parties do not discuss the matter, the 1999 American Arbitration Association's National Rules for the Resolution of Employment Disputes, which appear to be the most recent rules promulgated by the AAA to govern such disputes, do contain provisions regarding fees and costs associated with such arbitration and who will bear them. See 1998 WL 1527109 (A.A.A.); Boyd v. Town of Hayneville, Ala., 144 F. Supp. 2d 1272, 1275-77 (M.D. Ala. 2001). Those AAA rules also provide for hardship deferment and/or reduction and allocation of fees and costs in the award. See id.; Boyd v. Town of Haneyville, 144 F. Supp. 2d at 1277.

potential costs she might incur in connection with arbitration render the arbitration agreement unenforceable. Accordingly, the court orders that Keeton's claims must be litigated, if at all, in an arbitral forum. Because no claims remain to be litigated in this court, this action is due to be dismissed, without prejudice to re-file an appropriate action after the completion of arbitration. See Alford v. Dean Witter Reynolds, Inc., 975 F.2d 1161, 1164 (5th Cir. 1992); Clayton v. Woodmen of World Life Ins. Soc., 981 F. Supp. 1447, 1451 (M.D. Ala. 1997); Boyd v. Homes of Legend, Inc., 981 F. Supp. at 1443. Accordingly, Defendant's Motion to Dismiss (Doc. 20-3) is hereby GRANTED, Defendant's Motion to Stay (Doc 20-1) is DENIED, and Motion to Compel Arbitration (Doc. 20-2) is GRANTED. Defendant is hereby ORDERED to pay the fees and costs of arbitration in this matter. A separate dismissal order shall be entered.

Done and Ordered this 31st day of January, 2003

KARON OWEN BOWDRE
UNITED STATED DISTRICT JUDGE